**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

| | |
|---|---|
| In re<br><br>KAREN BRADY-ZELL,<br><br>      Debtor<br>_____<br><br>DANIELLE E. DEBENEDICTIS,<br><br>      Plaintiff<br><br>v.<br><br>KAREN BRADY-ZELL,<br><br>      Defendant | Chapter 7<br>Case No. 10-10922-FJB<br><br><br><br>Adversary Proceeding<br>No.  10-1119 |

**MEMORANDUM OF DECISION**

**Overview**

  By her complaint in this adversary proceeding, plaintiff Danielle E. deBenedictis ("deBenedictis"), an attorney, seeks a determination that the debt for legal fees owed to her for her representation of the defendant and debtor, Karen Brady-Zell ("Brady-Zell"), during the latter's divorce proceeding in 2007 is excepted from discharge under 11 U.S.C. § 523(a)(2)(A) as a debt arising from false representations and false pretenses by Brady-Zell.[1]  DeBenedictis argues that, by a promise of payment that she had no intent to honor, and by continuing false pretenses that she intended to pay, Brady-Zell

---

[1] In a cover sheet she filed with her complaint, deBenedictis indicated that she was also seeking a determination of nondischargeability under 11 U.S.C. § 523(a)(15). At the commencement of the trial, however, deBenedictis admitted that subsection (a)(15) was inapplicable to the debt at issue.  Therefore, I need not make findings and rulings under subsection (a)(15).
 At trial, deBenedictis indicated that she was also proceeding under § 523(a)(6), but she made no mention of that subsection in her proposed findings and conclusions and her closing arguments.  Therefore I conclude that she has waived any recourse to subsection (a)(6).  In any event, the allegations in the complaint do not state a claim on which relief can be granted under that subsection.

induced her to work long hours on the divorce proceeding and accrue legal fees significantly in excess of the amount of her initial retainer.  After a two-day trial, the Court now makes the following findings and rulings and, on the basis thereof, concludes that deBenedictis has not established cause to except this debt from discharge under 11 U.S.C. § 523(a)(2)(A).

**Findings of Fact and Procedural History**

This adversary proceeding is about deBenedictis' representation of Brady-Zell in divorce proceedings commenced in 2007 and the legal fees incurred in that representation.  Brady-Zell first contacted deBenedictis in the summer of 2007 in connection with marital issues with her spouse, Mr. Zell.  DeBenedictis and Brady-Zell spoke at length regarding these issues, but this contact did not extend beyond the initial consultation.

DeBenedictis' next contact with Brady-Zell was in October 2007.  By that time, Mr. Zell had commenced divorce proceedings against Brady-Zell, and she was represented in the divorce proceeding by another attorney.  Brady-Zell, dissatisfied with the representation of that attorney, approached deBenedictis to retain her as replacement counsel.  At that time, Brady-Zell informed deBenedictis, developments in the divorce proceedings had shown that it was possible that she had not in fact been properly divorced from her first husband in the Dominican Republic.  This, if true, would have resulted in dismissal of the pending divorce proceeding—because her marriage to Mr. Zell, her second husband, would then have been void.  Mr. Zell had filed a motion to dismiss the divorce proceeding on precisely that basis.  If that motion were granted, Brady-Zell would be ineligible for alimony and a distribution of Mr. Zell's assets.

Prior to deBenedictis' employment, the Probate Court judge had entered an order on October 1, 2007 that, in relevant part, ordered Mr. Zell to advance $25,000 to Brady-Zell's attorney for legal representation of Brady-Zell.  DeBenedictis agreed to represent Brady-Zell and, as a retainer, accepted and received the $25,000 that Mr. Zell had been required to advance on Brady-Zell's behalf.  Brady-Zell

2

and deBenedictis discussed and agreed on the terms of retention.  They had no written agreement.  However, in a letter dated October 10, 2007 (the "October letter"), deBenedictis memorialized the terms on which they agreed as follows:

> This will confirm that I have agreed to represent you in the above entitled matter [the then-pending divorce action] and to do all that is possible to avoid your Husband from establishing that your marriage to him is not legally valid.  I will accept the $25,000 which Judge Smoot ordered advanced to you by your Husband as a retainer and will bill you at $400 per hour against this retainer.  As we discussed, I will wait to be paid for the remainder of my services until the matter has been concluded as you have represented that you will not have any further funds until that time.

Though Brady-Zell now denies having received this letter, the evidence shows, and I find, that it was mailed to her and, by inference from its having been mailed, that Brady-Zell received it.  In addition, I find that it accurately summarizes the parties' fee agreement and Brady-Zell's promise of payment:  that deBenedictis would work and be paid at the rate of $400 per hour, that the first $25,000 of her fees and expenses would be covered by the retainer, and that she would wait to be paid for the remainder of her services until the divorce action was concluded.  Any suggestion by Brady-Zell that she understood $25,000 to be a flat fee or a cap on deBenedictis' fees is not credible.

I have no indication that, when they entered into the retention agreement, the parties discussed the amount of fees that deBenedictis might accrue in this representation.  DeBenedictis testified credibly that, after the representation commenced, the scope of the work for which she was hired grew well beyond what either of them expected at the time of retention.  DeBenedictis testified, "Karen and I were in complete agreement that we were spending a lot more time than we had ever, either one of us, intended."  For a period of approximately two months, the issue of her Dominican Republic divorce became paramount and all consuming.  Still, it is also true that the representation ended prematurely—that is, without having to see the divorce action through to conclusion, because Brady-Zell and her husband reconciled—and therefore the scope of the representation turned out, on the whole, to be

shorter and less involved than anticipated. There simply is no evidence as to how the parties' expectations at the time of retention compared to the hours that deBenedictis actually worked and the expenses she incurred.

The parties never put in place a system of periodic statements by which Brady-Zell could be apprised in detail of the accrual of time, fees, and expenses. Still, the evidence shows that, over the course of deBenedictis' service to Brady-Zell—which lasted to January 2008 and totaled 200 hours—Brady-Zell was involved on an almost daily basis with deBenedictis and her staff with respect to the details of the divorce action. She knew that it presented novel and complex issues, including, from the start, issues requiring investigation in, and familiarity with the laws of, the Dominican Republic. She knew that twists in the development of the case required research into concerns about immigration and criminal law. She was often present in deBenedictis' office. She emailed and called and spoke with deBenedictis frequently, at least once a day and usually more often. As deBenedictis worked on the case, Brady-Zell was keenly aware of the scope of the effort her case presented and, at least in a general way, that the amount of time it required quickly exceeded the 62.5 hours that, at best, would be funded with the court-ordered $25,000 retainer. Brady-Zell not only was aware of this but consistently urged deBenedictis to spare no expense to get the job done. In addition, Brady-Zell knew that deBenedictis had used $5,000 of the $25,000 retainer to pay for the services of an attorney in the Dominican Republic on Brady-Zell's behalf and that deBenedictis had advanced other monies on Brady-Zell's behalf for other legal services in the Dominican Republic. Notwithstanding the lack of periodic statements, she cannot claim to have been surprised that Brady-Zell's hours reached 200 and that total bill greatly exceeded $25,000. Her protestations to the contrary are not credible, a pure fabrication.

DeBenedictis testified that she believed, when she was retained and throughout the representation, that there were sufficient assets in the marital estate to enable Brady-Zell to pay her legal fees in full upon entry of the judgement for divorce and after a division of the marital assets; for

4

this reason, she agreed to wait to be paid in full until the matter had been concluded. Both parties anticipated, and agreed, that if the divorce proceeding ended in a judgment of divorce, the balance of deBenedictis' fees, if any, would be paid from the marital estate by operation of an award contained in the divorce judgment. "I didn't think there was any risk because of the extent of Mr. Zell's assets," deBenedictis testified.

It is clear that Brady-Zell agreed to pay the balance of deBenedictis' fees even if the parties reconciled, but I have no evidence that they agreed on a specific source of funds for that repayment. DeBenedictis does not contend that Brady-Zell had liquid assets from which payment could be made; to the contrary, deBenedictis agreed to wait for payment precisely because Brady-Zell had no liquid assets. And deBenedictis agreed to bill Brady-Zell at the rate of $400 per hour, instead of her usual rate of $500 per hour, because Brady-Zell was "less able" than her other clients to pay the fee. All agree that Brady-Zell was a stay-at-home mother and had no income of her own to pay deBenedictis' fees.

Both parties understood that, if payment were not made by divorce decree, it would have to come from either of two sources. First, Brady-Zell might prevail upon her husband to voluntarily pay Brady-Zell's debt from his own assets or substantial income. However, Mr. Zell was not obligated to pay this debt, and he had indicated no intent to pay it. In view of the bitterness of the divorce proceedings at the time, deBenedictis cannot have relied on this possibility. Second, Brady-Zell might pay the debt with the equity she had in two marital assets: a condo in Massachusetts and another in Florida. These were her only assets. On the financial statements that Brady-Zell and her husband each filed in their divorce action in September 2007, both husband and wife listed the Massachusetts condo as having a fair market value of $2.3 million; Brady-Zell indicated that the property was subject to a mortgage of $1.1 million; her husband quantified the mortgage debt at $1.45 million. Both indicated that that condo was held by husband and wife together in a tenancy by the entirety. With respect to the Florida condo, both husband and wife indicated that the property was held by husband and wife together in a tenancy

5

by the entirety, that its fair market value was $120,000, and that it was encumbered by a mortgage debt; the wife quantified the mortgage debt at $61,381, the husband at $64,000. DeBenedictis was aware of these statements and their contents. She therefore understood that, as of September 2007, Brady-Zell had interests in assets with available equity that might be used to pay her fee, but she also knew that both properties were owned with the husband in tenancies by the entirety, that the Massachusetts condo was the marital home, and that, by virtue of both of these facts, it would be difficult to sell or borrow against either property, at least without the husband's consent, and that his consent would not necessarily be forthcoming. In short, if payment was not to be made pursuant to a divorce decree, it was not clear that Brady-Zell had it within her power to pay the debt.

DeBenedictis performed billable services in the divorce action on Brady-Zell's behalf from October 2, 2007 through January 18, 2008. Brady-Zell and Mr. Zell reconciled around December 14, 2007, resulting in dismissal of the divorce action on January 24, 2008. At Brady-Zell's request, DeBenedictis provided additional service to Brady-Zell after December 14, 2007 and on or before January 18, 2008, in conjunction with the reconciliation and consequent dismissal of the divorce action. On January 23, 2008, deBenedictis sent Brady-Zell, by mail and email, a bill for the legal services provided by her since October 2007; she also gave her a copy of the bill in hand immediately after the hearing on dismissal of the divorce action, held on January 24, 2008. In the bill, deBenedictis accounted in detail for her time and billed $80,040 for a total of 200.1 hours of her own time. She also billed $5,000 for monies she advanced to counsel in the Dominican Republic for assistance in the case, and $2,392.54 for other expenses and fees, for a total bill of $87,432.54, against which she credited the $25,000 retainer, leaving a balance due of $62,432.54. Prior to this bill, DeBenedictis had not sent Brady-Zell billing statements documenting her hours as they accrued.

Upon receipt of this bill, Brady-Zell's first response was an email to deBenedictis' secretary on January 24, 2008: "It's a good thing this process ended………..I think I'll be selling my organs if this starts

up again.  Thanks, hope all is well with you.  Karen."  This was simply a recognition that she now owed a sizable debt, not, as she now contends (not credibly), an expression of surprise or disbelief at the amount of the debt.  She did not then, or at any time until after deBenedictis commenced suit against her to collect this debt, dispute the number of hours worked or billed or their necessity, the quality of the work, the validity of the expenses, her responsibility for the balance, or any aspect of the bill.  To the contrary, she consistently praised deBenedictis' work and remarked on how reasonable her fees were, especially in comparison to those that Mr. Zell had incurred in the same divorce proceeding.

She also made numerous representations to deBenedictis that payment of her bill was a priority for her and her husband and that they were working diligently on it.  In an email to deBenedictis on March 5, 2008, Brady-Zell said:

> Please don't think for a minute that I don't realize how long, hard and GREAT you worked for me.  David and I are trying desperately to organize the whole financial mess our lives are in.  I won't go into details right now, but I assure you that you are a priority to both of us.

In another email to deBenedictis, this time on March 25, 2008, Brady-Zell said:

> We are working on a selling [sic] a piece of property that David and his sister inherited recently.  This would enable us to pay both debts off.  I am going nuts trying to make it happen so I can put all these massive bills behind us.  I won't ignore them.

By "both debts" and "all these massive bills," Brady-Zell was referring, at least in part, to the debts for legal fees that Brady-Zell and her husband had incurred to their respective attorneys in the divorce proceeding; the amount owed for the husband's fees is not in evidence.  It is not clear what, if anything, Brady-Zell actually did to try to pay deBenedictis' bill.  She offered no testimony or other evidence on the issue at trial.  She offered no evidence as to precisely why her and her husband's lives were in a "financial mess," though there was evidence that Mr. Zell was facing health issues during that period.  Their legal fees were part of that picture, too, but it is hardly clear that these fees were disproportionate to their collective means and resources.  Notwithstanding the assurances of payment that she made to

7

deBenedictis, Brady-Zell never paid any portion of deBenedictis' bill. She offered no evidence or explanation as to why not; and, oddly, deBenedictis did not inquire into this subject at trial.[2]

Nor was evidence introduced that the two condos that constituted the sources of potential value with which Brady-Zell might have paid deBenedictis' fees retained their March 2007 values throughout 2008 and the period in which payment of this debt should have been effectuated. I make no finding as to how those values fared in 2008 and 2009. I merely note that, given the financial collapse of September 2008 and the softness in the real estate markets that preceded it, the retention of value in that particular period cannot be taken for granted.

Eventually, in March 2009, deBenedictis brought suit in state court against Brady-Zell to collect the fee. In response to deBenedictis' motion in that action for a real estate attachment, Brady-Zell, for the first time, began arguing that deBenedictis' fees were excessive and not fully earned and that the payment of $25,000 had been a flat fee. In view of her prior communications to deBenedictis, I find that these arguments were false and disingenuous, that Brady-Zell advanced them without a good faith belief in their truth. Rather, deBenedictis' claim for a balance of $62,432.54 was, in Brady-Zell's estimation, meritorious, and whatever may have been the reason for Brady-Zell's nonpayment of that debt, it had nothing to do with the merits of the claim. Brady-Zell's contention to the contrary is not credible.

Even while deBenedictis' state court action was pending, Brady-Zell and deBenedictis tried unsuccessfully to agree on a payment arrangement for the outstanding legal fees. On January 31, 2010, Brady-Zell filed a petition for relief under chapter 7 of the Bankruptcy Code, which stayed the still-pending state court action. DeBenedictis then timely filed the present complaint for determination of the dischargeability of her debt.

---

[2] In closing arguments, Brad-Zell argued that schedules she filed in her bankruptcy case show that there are no assets available to creditors, but her bankruptcy schedules were not introduced into evidence.

8

**Jurisdiction**

The matter before the court is a complaint under 11 U.S.C. § 523(a) to determine the dischargeability of a debt. The matter arises under the Bankruptcy Code and in a bankruptcy case and therefore falls within the jurisdiction given the district court in 28 U.S.C. § 1334(b) and, by a standing order of reference,[3] referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a). It is a core proceeding within the meaning of 28 U.S.C. § 157(b)(1).[4] The bankruptcy court accordingly has authority to enter a final order.

**Discussion**

    **a.    Positions of the Parties**

DeBenedictis argues that Brady-Zell's debt to her for legal fees is a debt that arose from a false representation and false pretenses: specifically, a false promise to pay at the commencement of the representation, and later repeated pretenses of assurance of payment. She further contends that Brady-Zell made the promise and assurances with knowledge of their falsity and intent to deceive and induce reliance, that deBenedictis did rely on them by performing legal services and incurring expenses, and that she was injured by Brady-Zell's ultimate failure and refusal to pay. She contends that Brady-Zell has shown herself in testimony to be dishonest and untrustworthy, denying even responsibility for the balance due, which deBenedictis construes as proof that Brady-Zell never intended to honor her promise of payment.

Brady-Zell argues that she did not make any false representations to deBenedicitis. Brady-Zell argues that she told deBenedictis that the only money she had available for the divorce was the $25,000 that the Probate Court had ordered Mr. Zell to advance on her behalf. She contends that she never promised to pay more than this; that she never signed a fee agreement with deBenedictis; that she

---

[3] The order of reference is codified in the district court's local rules at L.R. 201, D. Mass.
[4] See 28 U.S.C. § 157(b)(2)(I) (core proceedings include proceedings to determine the dischargeability of a particular debt).

9

never received any bills during the 108 days that deBenedictis worked on her divorce proceeding; that she never knew that the initial $25,000 had been exhausted; and that therefore her actions could not have induced or deceived deBenedicitis to continue providing legal services.  She contends that she herself is a victim of overbilling by deBenedictis.

    **b.**    **Applicable Law**

DeBenedictis seeks a determination that the legal fees incurred in representing Brady-Zell in her divorce are excepted from discharge under 11 U.S.C. § 523(a)(2)(A).  "In furtherance of the Bankruptcy Code's 'fresh start' policy, exceptions to discharge are narrowly construed."  *Danvers Savings Bank v. Maxyne Alexander* (*In re Alexander*), 427 B.R. 183, 193 (Bankr. D. Mass. 2010), citing *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997).  The burden falls upon deBenedictis, as the party asserting an exception from discharge, to prove that the debt comes squarely within an exception enumerated in 11 U.S.C. § 523(a); and she must prove her case by a preponderance of the evidence.  *Grogan v. Grogan*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991 (preponderance of the evidence standard applies to all exceptions from dischargeability in § 523(a)); *Palmacci* at 787.

Section 523(a)(2)(A) of the Bankruptcy Code excepts from discharge any debt for an extension of credit obtained "by false pretenses, a false representation, or actual fraud[.]"  11 U.S.C. § 523(a)(2)(A).  DeBenedictis uses the terms "false representation," "false pretenses," and "fraud" interchangeably in her complaint, but her complaint and request for rulings of law focus on alleged "false representations" and false pretenses made by Brady-Zell.  The alleged false representation is a false promise to pay, a promise made without intent to honor it, made at the commencement of the representation.  The false pretenses are pretenses of assurance of payment, made at various times during the course of the representation; deBenedictis is unclear, both in her complaint and in her evidence, as to precisely when and how these false pretenses were effected.

10

The First Circuit has established the elements that must be shown in order to establish that a debt is nondischargeable because it was obtained by a false representation. A creditor must show that: "(1) the debtor made a knowingly false representation;[5] (2) the debtor intended to deceive; (3) the debtor intended to induce the creditor to rely upon the false statement; (4) the creditor actually relied upon the misrepresentation; (5) the creditor's reliance was justifiable; and (6) the reliance upon the false statement caused damage." *McCrory v. Spigel* (*In re Spigel*), 260 F.3d 27, 32 (1st Cir. 2001) citing *Palmacci*, 121 F.3d at 786; *In re Burgess*, 955 F.2d 134, 139 (1st Cir. 1992) (as to elements other than reasonableness or justifiability of reliance). To determine whether a debtor made a knowingly false representation, I have to look at the time the debt was incurred.

> If, at the time [the debtor] made a promise, the debtor did not *intend to perform*, then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met). If he did so intend at the time he made his promise, but subsequently decided that he could not or would not so perform, then his initial representation was not false when made.

*Palmacci*, 121 F.3d at 786-87.

There are no disputes of law here, only disputes of fact, and all of these concern the first of the enumerated elements: a knowingly false representation. DeBeneditis alleges (i) that Brady-Zell made a promise to pay any fees and expenses incurred in excess of the $25,000 retainer and (ii) that she made this promise without intent to honor it. Brady-Zell denies having made any such promise at all, that instead they had agreed on a flat fee of $25,000; and she further contends that she did not know, when she is alleged to have made the promise, how large deBenedictis' fee would eventually be, and

---

[5] Instead of a false representation made knowingly, a creditor can prove a false representation made in reckless disregard of its truth. *McCrory v. Spigel (In re Spigel)*, 260 F.3d at 32. However, given the type of allegation here—a promise that is alleged to have been false—there is no question of reckless disregard. The representation, if false, was necessarily known to be false. A person cannot make a promise without knowing whether he or she does or does not resolve to honor the promise.

11

therefore that she cannot have known that she would owe fees in excess of $25,000 or, more to the point, formed an intent not to pay the same.

I have found that Brady-Zell did, as alleged, promise to pay deBenedictis for her services at the rate of $400 per hour and to pay her expenses; they did not agree on a cap or flat fee of $25,000. The more difficult question is whether, when Brady-Zell made this promise of payment, she intended to honor it. The burden is on deBenedictis to prove falsity, that Brady-Zell never intended to pay any balance.

Brady-Zell has by no means proven that she did intend to honor her promise. She was in almost every respect not credible in her testimony, and the evidence showed her to be capable of misrepresentations in important matters. The evidence shows that, at least when she retained deBenedictis, she had resources, equity in two condominiums, with which to fund payment of the fees. Her own representations to deBenedictis shortly after the fees became due suggested that her husband was intent on helping to get this debt paid. She offered no testimony or other explanation as to why, in view of her indications to deBenedictis that payment of this debt was a priority, this debt did not get paid. Her further contention, that she did not know, at the time of the promise or indeed at any later time, that the bill might exceed $25,000 is also not credible. If the burden were on Brady-Zell, she would lose. I certainly cannot find that she has acquitted herself of the alleged misrepresentation.

However, the burden is not on Brady-Zell. Rather, the burden is on deBenedictis to prove falsity by a preponderance of the evidence, and though the question is a close one, the evidence does not preponderate in her favor. First, deBenedictis testified that, after the representation was undertaken, the scope of her duties grew well beyond what either of them had anticipated. I do not know what either of them anticipated at the outset, but doubt on that issue must be resolved against deBenedictis. Second, there was at least some evidence of changed circumstances between the commencement of representation and the date when payment first became due. Mr. Zell had paid out approximately

$145,000 on attorney's fees—$120,000 for himself and $25,000 for Brady-Zell—and both were facing substantial additional fees. There was evidence that Mr. Zell was facing health issues. And 2008 was not, on the whole, a propitious year for property values. I do not know whether these circumstances account for the nonpayment of the fee.

Had the evidence shown that, in 2008, Brady-Zell had the ability to pay this debt, I could conclude that nonpayment was evidence of that the promise of payment was made without intent to pay. DeBenedictis did not attempt to show that in 2008, Brady-Zell had the ability to pay this debt: that she continued to have equity in the condos; that, notwithstanding her husband's co-ownership of these properties in tenancies by the entirety, she could borrow against or liquidate them; or that she had other options for paying the debt. The burden of exploring these issues, if they figured into deBenedictis' theory of the case at all, was on her. Lacking evidence on these issues, Brady-Zell's ability to pay remains uncertain, not a reliable basis for a finding that she never intended to pay.

I recognize the difficulty of establishing lack of intent to honor a promise. "Availability of direct evidence to prove a debtor's intent to deceive a creditor is unlikely to be obtained. The court, therefore, may infer fraudulent intent from the totality of circumstances." *Danvers Savings Bank*, 427 B.R. at 195, citing *Palmacci*, 121 F.3d at 789. In this instance, the totality of the circumstances is inconclusive, with the weight of the evidence split about even. The law, however, requires a preponderance, a tipping of the balance in favor of the plaintiff. For lack of a preponderance on this issue, the Court must resolve this issue in favor of the defendant.[6]

DeBenedictis relies on alleged false pretenses as an alternate basis of recovery: pretenses of intent to honor the promise of payment as to new fees and expenses as these were accruing. I have found that deBenedictis has failed to carry her burden with respect to showing that Brady-Zell's did not intend to honor her promise to pay when she initially made that promise. By virtue of the same

---

[6] Having found that deBenedictis has not sustained her burden as to the falsity of the promise, I need not address the remaining elements.

13

evidence and findings, I further conclude that deBenedictis has also failed to carry her burden of proving that Brady-Zell lacked intent to pay at any time during the accrual of deBenedictis' fees and expenses. Therefore, this alternate basis of recovery fails, too.[7]

**Conclusion**

On the basis of the foregoing considerations, I conclude that Brady-Zell's debt to deBenedictis is not excepted from discharge. Judgment will enter accordingly.

Date:  April 2, 2013                             _____
                                                 Frank J. Bailey
                                                 United States Bankruptcy Judge

---

[7] I therefore need not address the difficulties posed by the complaint's failure to plead with particularity precisely when and how these false pretenses were effected and by the vagueness in the evidence as to these particulars.